UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

**FILED**

MAR 0 4 2014

CLERK

| | | |
|---|---|---|
| HELEN DENISE SYMENS, | * | CIV 13-3006-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | AFFIRMING FINAL DECISION |
| CAROLYN W. COLVIN, | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |

Plaintiff Helen Denise Symens seeks reversal of the Commissioner of Social Security's decision denying Symens's application for Social Security Disability Insurance (SSDI) benefits. Alternatively, Symens requests that this Court remand the case for a further hearing on issues she has raised. For the reasons explained below, this Court affirms the final decision of the Commissioner of Social Security.

I.    **Procedural Background**

On August 8, 2009, Symens filed an application for SSDI benefits and attendant Medicare under Title II and Title XVIII of the Social Security Act alleging disability since January 10, 2009, due to rheumatoid arthritis, Sjogren's Syndrome, degeneration of her cervical spine, depression, recurrent infections and mouth sores, and side effects from her medications. AR[1] 13, 145, 169. The Social Security Administration denied Symens's application initially on December 22, 2009, AR 74, and again upon reconsideration on March 4, 2010, AR 82. In March 2010, Symens requested a hearing before an Administrative Law Judge (ALJ). AR 86. The ALJ conducted a hearing, AR 33, and issued a decision in May 2011 finding that Symens was not

---

[1]Citations to the appeal record will be cited as "AR" followed by the page or page numbers.

disabled and thus was not entitled to benefits, AR 13-28. Symens then requested that the Appeals Council review the ALJ's decision along with new evidence which request was denied on December 19, 2012. AR 1-6.

## II.    Factual Background

Symens was born on May 24, 1971. AR 38, 145. She obtained a bachelor's degree in wildlife and fishery sciences from Arkansas Technical University in 1994, and a master's degree in fishery biology from South Dakota State University in 1998. AR 38-39. Symens and her husband Curtis have two children. AR 145, 258.

In 1998, Symens began working as a fish hatchery biologist at the United States Fish and Wildlife Service fish hatchery in Yankton, South Dakota. AR 170, 257. She left her job in Yankton in 2001 to take a position as a fisheries research associate at the University of Arkansas. AR 170, 257. She held this position until 2006, when she and Curtis opened a grocery store in Willow Lake, South Dakota. AR 170, 257. The grocery store encountered financial difficulties and closed in 2008. AR 40, 232, 257. Symens was enrolled in Lake Area Technical Institute's licensed practical nurse program from August 2008 until July 2009. AR 39, 232, 258. She stated that she was unable to complete the program due to pain. AR 39, 232. Symens's most recent work attempt was as a Pampered Chef consultant from April 2010 to June 2010. AR 43, 232.

Symens's relevant medical history begins with a September 23, 2008 appointment with physician's assistant (P.A.) Louann Streff. AR 390. Symens complained of joint pain and P.A. Streff suggested that she take ibuprofen. AR 390. Symens saw Dr. Rebecca Pengilly, her family physician, on September 30, 2008. AR 329. Symens explained that she had developed pain and stiffness in her hands approximately three months ago. AR 329. She also reported pain in her

2

knees and sometimes her ankles. AR 329. Dr. Pengilly examined Symens and found a "little bit" of redness and warmth of the metacarpophalangeal (MCP) joints and a "touch" of swelling of the proximal interphalangeal (PIP) joints. AR 329. Symens hands were tender with flexion and extension. AR 329. Although Symens's knees cracked when she bent them, Dr. Pengilly found no problems at that time with Symens's wrists, elbows, shoulders, ankles, hips, or toes. AR 329. AR 344. Dr. Pengilly assessed Symens as having polyarthralgia and prescribed a short course of Prednisone.[2]   AR 329.   Symens returned to P.A. Streff on October 1, 2008, complaining of swollen joints. AR 389. P.A. Streff noted some mild swelling in Symens's hands and assessed Symens as having swollen joints. AR 389.

On October 8, 2008, Symens saw Dr. Pengilly for joint pain, reporting pain in her wrists and knees. AR 324. The previous prescription for Prednisone had helped ease Symen's pain, but had not resolved the issue. AR 324. Dr. Pengilly's examination revealed that Symens had tenderness in her MCP joints but not much swelling, and some swelling of her PIP joints. AR 324. Dr. Pengilly noted that Symens's wrists had a full range of motion and were not swollen and that her shoulders and elbows were fine. AR 324. Dr. Pengilly assessed Symens as having polyarthralgia, recommended that she see a rheumatologist, and prescribed Relafen[3] and Ultram.[4] AR 324.

---

[2]Prednisone is a corticosteroid used as an anti-inflammatory or immunosuppressant medication. See Drugs.com, Prednisone, http://www.drugs.com/prednisone.html (last visited Feb. 17, 2014).

[3]Relafen is a nonsteroidal anti-inflammatory drug used in the treatment of arthritis. See Drugs.com, Relafen, http://www.drugs.com/relafen.html (last visited Feb. 17, 2014).

[4]Ultram, or Tramadol, is a narcotic-like pain reliever used to treat moderate to severe pain. See Drugs.com, Ultram, http://www.drugs.com/ultram.html (last visited Feb. 17, 2014).

Symens saw P.A. Streff on October 27, 2008, for a follow up on a previous diagnosis of hypothyroidism.[5]  AR 388.  Symens also complained of problems with her eye and pain in her hands.  AR 388.  P.A. Streff examined Symens but did not find much in the way of joint swelling, noting that there "might be a little bit" of swelling in Symens's hands but "certainly nothing grossly inflamed."  AR 388.  P.A. Streff assessed Symens as having joint pain and hypothyroidism.  AR 388.

Symens saw Dr. Wayne Snyder, her opthamologist, on January 6, 2009.  AR 288.  Symens had experienced eye trouble in the past, being assessed or diagnosed with retinoschisis,[6] AR 277, 245, 280, possible uveitis,[7] AR 245, 254, and episcleritis,[8] AR 254, 280.  Dr. Snyder diagnosed Symens with retinoschisis.  AR 292.

Symens revisited P.A. Streff on January 7, 2009, reporting neck pain for which she had seen a chiropractor.  AR 386.  P.A. Streff's examination of Symens showed tenderness in the

---

[5]"Hypothyroidism is a condition in which the thyroid gland does not make enough thyroid hormone."  MedlinePlus, U.S. National Library of Medicine, National Institutes of health, http://www.nlm.nih.gov/medlineplus/ency/article/000353.htm (last visited Feb. 17, 2014). Symens took Synthroid to treat her hypothyroidism.  AR 330, 381.

[6]"Retinoschisis means splitting of the eye's retina into two layers."  NORD, Retinoschisis, http://www.rarediseases.org/rare-disease-information/rare-diseases/byID/517/viewAbstract  (last visited Feb. 17, 2014).

[7]"Uveitis is swelling and irritation of the uvea, the middle layer of the eye."  MedlinePlus, U.S. National Library of Medicine, National Institutes of health, http://www.nlm.nih.gov/medlineplus/ency/article/001005.htm (last visited Feb. 17, 2007).  "Uveitis can be caused by autoimmune disorders such as rheumatoid arthritis or ankylosing spondylitis, infection, or exposure to toxins.  However, in many cases the causes is unknown." Id.

[8]"Episcleritis is irritation and inflammation of the episclera, a thin layer of tissue covering the white part (sclera) of the eye.  It occurs without an infection."  MedlinePlus, U.S. National Library of Medicine, National Institutes of health, http://www.nlm.nih.gov/medlineplus/ency/article/001019.htm (last visited Feb. 17, 2014). The cause of Episcleritis is usually unknown but it may occur with certain diseases such as rheumatoid arthritis and Sjogern's syndrome. Id.

4

paravertebral musculature and around the cervical spine. AR 386. An x-ray revealed no gross

bony abnormalities. AR 386. P.A. Streff assessed Symens as having neck pain and prescribed

Flexeril.[9] AR 386.

Symens had her first visit with her rheumatologist, Dr. Christine Halligan, on January 12,

2009. AR 456. Symens explained that she developed joint pain shortly after she developed

scleritis[10] and that she now had pain in her wrists, elbows, shoulders, knees, ankles, feet, and

MCP and PIP joints. AR 456. She described her pain as being worse in the morning but present

all day, having swelling in her hands and feet, and having difficulty making a fist. AR 456.

Symens stated, however, that her joint pain "essentially resolved" while she was on Prednisone.

AR 456. Dr. Halligan's examination of Symens revealed bilateral synovitis[11] in the first, second,

and third MCP joints, the second and third PIP joints, and wrists. AR 454. Symens also had

diffuse synovitis in her metatarsals. AR 454. Symens's gait and cervical and lumbar range of

motion was appropriate for her age and her proximal and distal strength in her upper and lower

extremities was intact. AR 454. She was able to make a fist bilaterally and had weak to

moderate grip strength. AR 454. Dr. Halligan's impressions from the appointment were that

Symens had a positive rheumatoid factor, a new onset of visual changes in her left eye, and

---

[9]Flexeril is a muscle relaxant used to treat skeletal muscle conditions such as pain or injury. See Drugs.com, Flexeril, www.drugs.com/flexeril.html (last visited Feb. 17, 2014).

[10]There was some confusion among Symens and her doctors concerning which eye conditions she had. Although several of her doctors mentioned in their treatment notes that Symens had scleritis, Dr. Halligan ultimately concluded that Symens had never been diagnosed with this condition. AR 441.

[11]"Synovitis is the inflammation of a synovial (joint-lining) membrane, usually painful, particularly on motion, and characterized by swelling, due to effusion (fluid collection) in a synovial sac." Health Central, Synovitis, http://www.healthcentral.com/encyclopedia/408/628.html (last visited Feb. 17, 2014). "Rheumatoid arthritis involves synovitis. In rheumatoid arthritis, the synovial membrane lining the joint becomes inflamed." Id.

inflammatory arthritis. AR 454. Dr. Halligan ordered x-rays, prescribed a course of Prednisone, and started Symens on Methotrexate[12] shortly thereafter. AR 452. Because Symens had complained of a bright light in her left eye, Dr. Halligan had her see Dr. Eric Thomas, an opthamologist, that same day. AR 251, 450. Dr. Thomas's impressions were that Symens had a history of "episcleritis/uveitis" and retinoschisis. AR 252. He stated that "overall things with [Symens's] eyes look to be quite stable . . . . [s]he does have a mild amount of retinoschisis, however this is very common, and is most likely not related to the rheumatoid arthritis at all." AR 252.

Symens saw Dr. Pengilly on January 23, 2009, for a painful spot in her mouth. AR 322. Dr. Pengilly assessed Symens as having herpes labialis and prescribed Symens Acyclovir.[13] AR 322. Symens saw Dr. Pengilly again on February 4, 2009, for pain in her right foot. AR 321. Symens reported that she was having difficulty walking. AR 321. Although x-rays from the appointment showed a small post calcaneal spur, there was no evidence of fracture, periosteal reaction, or significant arthritic change. AR 318, 321, 332. Dr. Pengilly prescribed Ultram, placed Symens in a walking boot for a week, and referred her to Dr. Shannon Engel, a podiatrist. AR 321. Dr. Engel's February 10, 2009 examination of Symens revealed pain in both feet at the metatarsal phalangeal joints one through five but a normal range of motion in the ankles and

---

[12]Methotrexate is used to treat, among other things, severe rheumatoid arthritis that cannot be controlled by certain other medications. See U.S. National Library of Medicine, National Institutes of health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682019.html (last visited Feb. 17, 2014).

[13]Acyclovir is an antiviral drug used to treat infections caused by herpes viruses. See Drugs.com, Acyclovir, http://www.drugs.com/acycvlovir.html (last visited Feb. 17, 2014).

subtalar joints. AR 318. Dr. Engel hoped that Symens's rheumatoid arthritis medication would help with the pain and recommended icing, limited activity, and insoles. AR 318.

Symens saw Dr. Halligan again on March 13, 2009. AR 450. She reported that her neck and back were doing fairly well but that she was having severe foot pain and had difficulty standing for prolonged periods. AR 448-49. Symens had some mild tenderness in her fourth and fifth metatarsals on the right but her feet were not swollen and she did not indicate any significant amount of discomfort with palpitation. AR 448. Dr. Halligan observed some tenderness in Symens's wrists and noted that Symens may have some swelling there. AR 448. A joint examination showed no obvious synovitis in Symens's upper or lower extremities. AR 448. Symens's gait and cervical and lumbar range of motion was appropriate for her age and her proximal and distal strength in her upper and lower extremities was intact. AR 448. The x-rays of Symens's hands, feet, and chest from her prior appointment were unremarkable. AR 450. Dr. Halligan's impressions from the appointment were that Symens had episcleritis in her left eye, a positive rheumatoid factor, and inflammatory arthritis. AR 448. She noted that Symens "continues to have joint symptoms despite currently treatment [sic]." AR 448. Dr. Halligan noted that the Methotrexate was not "fully efficacious" at that time and prescribed Humira[14] and Mobic[15] for Symens's pain. AR 446-47.

---

[14]Humira reduces the effects of a substance in the body that can cause inflamation and is used to treat rheumatoid arthritis. See Drugs.com, Humira, http://www.drugs.com/humira.html (last visited Feb. 17, 2014).

[15]Mobic is a nonsteroidal anti-inflammatory drug used to treat pain or inflammation caused by rheumatoid arthritis. See Drugs.com, Mobic, http://www.drugs.com/mobic.html (last visited Feb. 17, 2014).

Symens returned to Dr. Pengilly on April 3, 2009, because of neck pain. AR 317. Dr. Pengilly noted that a recent x-ray showed "a little bit of narrowing" between C6 and C7 of Symen's spine but was otherwise "ok." AR 317. Symens had a full range of motion in flexion and extension of her neck, but it hurt to turn her head in either direction and she had pain in her strap muscles upon palpitation. AR 317. Dr. Pengilly assessed Symens as having a cervical strap muscle strain with spasms and prescribed Ultram. AR 317. Symens saw Dr. Pengilly again on April 27, 2009. AR 316. Symens reported that she had a fever, neck pain, a headache, fatigue, and nausea. AR 316. Dr. Pengilly assessed Symens as having an upper respiratory infection and prescribed Mobic. AR 316.

Symens visited Dr. Halligan for a reevaluation on May 12, 2009. AR 445. Symens reported that she was eighty to ninety percent improved. AR 445. Although she still had pain in her neck and feet and stiffness in the morning, these problems had lessened. AR 445. Symens showed no obvious synovitis in her upper or lower extremities, some tenderness to palpitation in her right hand MCP, and no tenderness to palpitation in her metatarsals. AR 444. Symens's gait and cervical and lumbar range of motion were appropriate for her age as was her proximal and distal strength in her upper and lower extremities. AR 444. Dr. Halligan's impressions were that Symens had episcleritis in her left eye, a positive rheumatoid factor, and inflammatory arthritis. After noting that Symens was "much improved" on Humira, Dr. Halligan recommended that Symens continue her current protocol. AR 443.

On June 6, 2009, Symens saw Dr. Pengilly for itchy eyes. AR 315. Dr. Pengilly remarked in her notes that Symens had a history of anxiety and depression and that Symens was

taking Zoloft.[16]  AR 315.  Dr. Pengilly assessed Symens as having "[a]llergic conjunctivitis, possibly superimposed fungal infection," and anxiety with depression. AR 315. She prescribed a short course of Diflucan.[17]  AR 315.

Symens saw Dr. Snyder on June 19, 2009, for eye pain. AR 300. Dr. Snyder diagnosed Symens with stable retinoschisis and optic neuritis.[18]  AR 302. On June 23, 2009, Dr. Halligan consulted with Dr. Snyder concerning how Symens's arthritis medication was affecting her left eye. AR 442. After Symens had an MRI, Dr. Snyder did not think that she had any swelling of the optic nerve or an underlying infection. AR 442. Thus, he felt that Symens could continue with immunosuppression. AR 442.

Symens saw Dr. Pengilly primarily for herpes labialis on June 24, 2009. AR 314. Symens complained of fatigue, pain and swelling in the right wrist, and pain in the right ankle and foot. AR 314. An examination showed that Symens had a little bit of swelling of the right wrist and pain with flexion or extension and pain on the top of her right foot but no swelling or loss of range of motion. AR 314. Dr. Pengilly assessed Symens as having herpes labialis, rheumatoid arthritis,  and right wrist and foot pain that was "possibly secondary" to the

---

[16]Zoloft is a selective serotonin reuptake inhibitor used to treat depression and anxiety. See Drugs.com, Zoloft, http:www.drugs.com/zoloft.html (Last visited Feb. 18, 2014).

[17]Diflucan   is   a   antifungal   antibiotic.   See   Drugs.com,   Diflucan, http://www.drugs.com/diflucan.html (last visited Feb. 18, 2014).

[18]Optic neuritis is an inflamation of the optic nerve. See Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/optic-neuritis/basics/definition/con-20029723 (last visited Feb. 18, 2014).

rheumatoid arthritis. AR 314. Dr. Pengilly prescribed Valtrex[19] and a Medrol[20] dose pack. AR 314.

Symens visited Dr. Pengilly on July 8, 2009, for ear pain. AR 313. Dr. Pengilly noted that Dr. Halligan had taken Symens off of Methotrexate and Prednisone to allow Symens's cold sores to resolve. AR 313. A wrist examination revealed "a bit" of swelling and some pain. AR 313. Dr. Pengilly prescribed a Medrol dose pack and told Symens to come back in a week to ten days. AR 313. If Symens's cold sores had resolved by that time, Dr. Pengilly would call Dr. Halligan and have her restart Symens on Methotrexate and Prednisone. AR 313. Symens saw P.A. Streff the following day for urinary problems and lower back pain. AR 380. P.A. Streff assessed Symens as having a probable urinary tract infection and prescribed an antibiotic. AR 380. Symens revisited P.A. Streff on July 13, 2009, this time complaining of right ear pain. AR 379. P.A. Streff assessed Symens as having otitis externa and prescribed ear drops. AR 379.

Symens saw Dr. Pengilly for a recheck on July 20, 2009. AR 312. Symens reported swelling in her wrists and "being really achy and tired[.]" AR 312. On physical examination, Dr. Pengilly noted that Symens looked "very tired," that her wrists were "a bit" swollen and tender, and that her CMP joints were tender but not swollen. AR 312. Although Symens's herpes labialis had resolved, Dr. Pengilly thought that Symens's rheumatoid arthritis had worsened since she stopped taking Methotrexate. AR 312. Dr. Pengilly restarted Symens on

---

[19]Valtrex is an antiviral drug that is used to treat infections caused by herpes viruses. See Drugs.com, Valtrex, http://www.drugs.com/valtrex.html (last visited Feb. 18, 2014).

[20]Medrol is a corticosteroid used to treat arthritis and skin conditions. See Drugs.com, Medrol, http://www.drugs.com/cdi/medrol.html (last visited Feb. 18, 2014).

Methotrexate and gave her a short course of Prednisone to get her rheumatoid arthritis under control. AR 312.

Symens returned to Dr. Pengilly on August 3, 2009, for neck pain. AR 311. Dr. Pengilly remarked that Symens was trying to go back to school and that "some of [her neck pain] is stress. She also has a history of rheumatoid arthritis and she has still some joint swelling and pain." AR 311. On examination, Dr. Pengilly noted that Symens appeared tired, had some swelling of the MCP joint, and had a limited range of motion in her neck with pain in the cervical strap muscles down into the trapezius. AR 311. Dr. Pengilly prescribed Mobic and Ultram and recommended that Symens see Dr. Halligan. AR 311.

Symens's neck pain persisted and she saw Dr. Pengilly again on August 7, 2009. AR 310. Symens reported pain in her neck, numbness in her hands, and swelling in her wrists and MCP joints. AR 310. An examination showed that Symens had some swelling in her wrists and the MCP joint but that she could flex and extend and her grip was "okay." AR 310. Symens had a positive Phalen's maneuver on both sides with the right being worse than the left. AR 310. She also had a positive Tinel's test on the right and a weakly positive Tinel's sign on the left.[21] AR 310. Dr. Pengilly assessed Symens as having rheumatoid arthritis and bilateral carpal tunnel syndrome.[22] AR 310. She thought that Symens's rheumatoid arthritis was causing the carpal

---

[21]The Tinel's test and Phalen's maneuver are both commonly used to detect carpal tunnel syndrome. See WebMD, http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited Feb. 18, 2014).

[22]"Carpal tunnel syndrome occurs when the median nerve is compressed because of swelling of the nerve or tendons or both. The median nerve provides sensation to the palm side of the thumb, index, middle finger, and the inside half of the ring finger. It also gives power to, or innervates, muscles in the forearm and hand that allow a pincher grasp (the ability to grasp an object between the thumb and forefinger). When this nerve becomes impinged, or pinched, numbness, tingling, and sometimes pain of the affected fingers and hand may occur and radiate into the forearm." WebMD, http://www.webmd.com/pain-management/carpal-tunnel/carpal-tunnel-syndrome (last visited Feb.

tunnel syndrome. AR 310. Dr. Pengilly prescribed a Medrol dose pak. AR 310. A lab test from

August 9, 2009, as well as lab testing at later times showed that Symens had an elevated C-

reactive proteins (CRP) level, likely related to the rheumatoid arthritis.[23] AR 267; see AR 335,

434, 463-64, 546.

Symens saw Dr. Halligan for a reevaluation on August 12, 2009. AR 441. Symens

complained of pain in her wrists, MCP joints, knees, feet, and neck, as well as swelling of her

right wrist. AR 440. Symens stated that her pain was worse in the morning or after she had

engaged in strenuous activity and that she "was a nursing student but [did] not feel that she

would be able to do this due to the degree of fatigue that she has." AR 440. On examination,

Dr. Halligan noted aphthous ulcers on Symens's gums, no obvious synovitis in her upper or

lower extremities, no tenderness upon palpitation in the MCP and PIP joints, and no tenderness

over fibromyalgia trigger points. AR 439-40. Symens had excellent grip strength, her gait and

cervical and lumbar range of motion were appropriate for her age, and her proximal and distal

strength in her upper and lower extremities was intact. AR 439. In her notes from the

appointment, Dr. Halligan stated:

> I discussed with the patient I think it is likely that she [has] rheumatoid
> arthritis as the cause of her multiple joint symptoms. I see no evidence
> of synovitis on her examination. I have discussed with the patient that
> her degree of pain seems to be out of proportion to what her physical
> examination would explain. She believes the prednisone has helped her
> only 50%.

18, 2014).

[23] "C-reactive protein is produced by the liver. The level of CRP rises when there is
inflammation throughout the body." U.S. National Library of Medicine, National Institutes of health,
http://www.nlm.nih.gov/medlineplus/ency/article/003356.htm (last visited Feb. 18, 2014). A CRP
test is sometimes used to check for rheumatoid arthritis, although it is not necessarily definitive. Id.

AR 439.  Dr. Halligan remarked that she wanted to see whether Symens showed signs of synovitis when Dr. Pengilly started her on Prednisone.  AR 438.  Dr. Halligan took Symens off of Methotrexate due to Symens's aphthous ulcers, but recommended that Symens continue with the Humira, use Prednisone for pain, and begin taking Arava.[24]  AR 438.  Dr. Halligan also ordered several lab tests and cervical spine x-rays.  AR 438.  Symens's spine x-rays showed "[f]ocal disc space narrowing at C6-C7 with straightening of the normal cervical lordosis in neutral position but no subluxation as described[,]" AR 484.

In conjunction with her application for disability benefits, Symens completed a disability report on August 23, 2009.  AR 168.  Symens stated in the report that her pain and fatigue made it difficult for her to concentrate and limited her ability to do household chores and engage in physical activity.  AR 169, 180.  She described her pain as being so severe on some days that it prevented her from doing anything around her house.  AR 180.  Symens's application stated:

> I told my doctor that I had been thinking of applying for SSDI, and she
> said she thought I could work.  To be honest, I just cried, and said I am
> not the kind of person to just quit work and my dreams, but it is hard
> when I can't walk without pain and have trouble getting out of bed due
> to fatigue.

AR 180.

Symens saw P.A. Streff on August 24, 2009 for urinary problems.  AR 378.  Symens also complained of an increase in joint pain and swelling.  AR 378.  P.A. Streff prescribed Diflucan.  AR 378.

---

[24]Arava reduces swelling and inflamation in the body and is used to treat rheumatoid arthritis symptoms.  See Drugs.com, Arava, http://www.drugs.com/arava.html (last visited Feb. 18, 2014).

Symens saw Dr. Pengilly on September 9, 2009, because she was concerned that she had a urinary tract infection. AR 347. An exam showed that Symens had a "little bit" of swelling in her left wrist but that the rest of her extremities were normal. AR 347. Dr. Pengilly assessed Symens as having a history of urinary irritation with nausea and rheumatoid arthritis. AR 347. Dr. Pengilly noted that Symens had been prescribed Cipro while in California and had been taking it for ten days and prescribed Zofran.[25] AR 347. Symens continued to have urinary problems and saw Dr. Karam Pathan, a urologist, on September 24, 2009. AR 352. Dr. Pathan examined Symens and found that her extremities were normal. AR 353. He assessed Symens as having recurrent urinary tract infections and ordered several tests. AR 353.

Symens completed a function report on September 30, 2009. AR 197. She indicated that she cared for her two children, ages six and nine, and described her activities as including washing dishes, doing laundry, mowing, cooking basic meals, getting groceries when she was in town, paying bills, and helping her children with their homework and preparing them for bed. AR 197, 199, 200. Symens stated, however, that her pain and other symptoms sometimes made it difficult or impossible to do some of these activities. AR 197, 199, 200. She also described needing to rest frequently throughout the day, AR 197, being unable to lift more than eight pounds, and only being able to walk twenty to thirty minutes before needing to rest, AR 202.

Symens returned to Dr. Pathan on October 8, 2009, for a cystoscopy.[26] AR 354. The cystoscopy showed proximal narrowing in the urethra and descent in the bladder floor. AR 354.

---

[25]Zofran blocks the actions of chemicals in the body that can trigger nausea and vomiting. See Drugs.com, Zofran, http://www.drugs.com/zofran.html (last visited Feb. 18, 2014).

[26]A cystoscopy is a test that allows a doctor to view the inside of the bladder and the urethra. WebMD, http://www.webmd.com/a-to-z-guides/cystoscopy-16692 (last visited Feb. 18, 2014).

Dr. Pathan remarked that the combination of these conditions and Symens's immune suppressive medication presented an ideal situation for recurrent urinary tract infections. AR 354.

Symens saw P.A. Streff on October 13, 2009, for flu symptoms and ongoing nausea. AR 426. P.A. Streff prescribed Tamiflu and Zofran. AR 426. Symens saw P.A. Streff again on October 27, 2009, this time for neck pain. AR 425. An exam revealed palpable muscle spasms in Symens's upper trapezius. AR 425. P.A. Streff prescribed Flexeril. AR 425.

Symens saw Dr. Halligan for a reevaluation on November 5, 2009. AR 436. Symens reported intermittent paresthesias in her hands and feet and swelling in her hands. AR 435. On examination, Symens had no obvious synovitis, a normal range of motion, an appropriate gait, and intact strength in her upper and lower extremities. AR 434. She was not tender over fibromyalgia trigger sites. AR 434. Although Dr. Halligan told Symens that rheumatoid arthritis was likely causing Symens's symptoms, she expressed some concern that Symens may have "some noninflammatory muscle and joint pain." AR 432-33. Dr. Halligan diagnosed Symens as having rheumatoid arthritis, paresthesias, and a history of retinoschisis. AR 432. She recommended that Symens continue taking Humira and Arava, and that she take Tramadol as needed for her pain. AR 433.

Symens visited P.A. Streff on November 9, 2009, complaining of considerable right foot pain. AR 424. An examination of Symens's extremities showed tenderness but no swelling. AR 424. X-rays of Symens's foot showed a small posterior calcaneal spur but no evidence of arthritic change, fracture, or periosteal reaction. AR 415, 424. P.A. Streff assessed Symens as having foot pain and told her to continue taking her current medications. AR 424.

Several doctors conducted assessments of Symens in relation to her application for SSDI benefits. At the South Dakota Department of Human Services' behest, Symens saw psychologist

Frank Dame on December 14, 2009. AR 256. Symens reported that her rheumatoid arthritis caused her constant chronic pain and that her activities were restricted because of joint pain and stiffness in the feet, ankles, hands, wrists, neck, and knees. AR 258. She stated that she could not comfortably bend, stoop, lift, carry, stretch, walk for more than 100 yards, or sit for longer than fifteen to twenty minutes. AR 258. Symens said that she was painful and stiff in the morning and that her wrist pain impaired her ability to dress. AR 259. She reported going back to bed after getting her children ready for school and then getting up and showering, dressing, vacuuming, and doing laundry and book work. AR 259. Symens noted, however, that she was only able to engage in those tasks for twenty to thirty minutes, that she required twenty minutes of rest afterwards, and that she felt "intense pain in her hands and neck" after more than thirty minutes of activity. AR 259. Symens shopped for groceries despite her pain and prepared dinner three times a week. AR 259. On other days Symens relied on prepared foods or sandwiches and soup. AR 259. Dr. Dame noted that Symens had to stand and stretch several times during the appointment, but found that Symens's concentration and attention were "only mildly and periodically impaired[.]" AR 259-60. When discussing Symens's mental status, Dr. Dame remarked: "In her emotional presentation there was evidence of depression, some anxiety and the former appeared to reach clinically significant levels of severity." AR 259. Dr. Dame concluded that "the results of the present examination indicate that [Symens] is seriously disabled by virtue of the medical diagnosis of rheumatoid arthritis." AR 261.

Dr. K. Terry, a non-examining state-agency physician, completed a physical residual functional capacity (RFC) assessment of Symens on December 16, 2009. AR 356-363. Dr. Terry found that Symens could lift 20 pounds occasionally, lift 10 pounds frequently, and could stand and/or walk for approximately six hours or sit for about six hours within an eight-hour

work day. AR 357. He noted that Symens did have some postural limitations, however, finding

that Symens could only occasionally climb, stoop, kneel, crouch, and crawl. AR 358. In the

"additional comments" section of the RFC form, Dr. Terry noted that Symens had shown normal

strength and gait during a March 2009 appointment and a functional range of motion during a

November 2009 appointment. AR 363. Dr. Terry stated that Symens's rheumatoid arthritis

medication had improved her symptoms and that although he found her statements mostly

credible, she was expected to continue to improve. AR 363.

On January 12, 2010, Symens saw Dr. Eric Peterson, an orthopedic surgeon, for

evaluation of her right wrist. AR 430. Symens reported pain in her right wrist and thumb and

weakness when trying to open bottle caps or buttoning buttons. AR 430. An examination

showed that Symens had a positive Finkelstein's test[27] on the right, "5/5" strength against

resistance in her wrist, and full active motion in her hand and arm motions. AR 430. Dr.

Peterson also noted an equivocal cyst on Symens's right wrist. AR 430. He diagnosed Symens

with, among other things, right de Quervain's tenosynovitis, and recommended a steroid

injection and physical therapy.

On January 20, 2010, Symens saw Dr. Greg Mumm, one of Dr. Halligan's associates.

AR 557. Symens reported joint pain, morning stiffness with pain worsening at the end of the

day, episodic paresthesias in her hands and feet, and pain in her right hip while driving. AR 557.

Dr. Mumm noted that Symens's lab work from earlier that month was all within normal limits

---

[27]The Finkelstein test is used to confirm whether a patient has de Quervain's tenosynovitis.
See Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/tests-diagnosis/con-20027238 (last visited Feb. 14, 2014). De Quervain's tenosynovitis is a painful condition affecting the tendons on the thumb side of the wrist. See Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/definition/con-20027238 (last visited February 18, 2014).

and that her hand and foot x-rays from January 2009 showed no evidence of erosive disease. AR 557. An examination revealed a positive Finkelstein's test and mild tenderness in Symens's hands and right hip. AR 558. There was no definite synovitis, however, and Symens had a normal range of motion in her hands, wrists, elbows, shoulders, hips, ankles, and knees. AR 558. She also had a negative Phalen's maneuver and normal fine touch sensation and motor strength. AR 559. Dr. Mumm's impressions were seropositive rheumatoid arthritis with persistent joint pain and episodic paresthesias in the hands and feet. AR 559. Dr. Mumm opined that the Arava could be causing Symens's paresthesias and ordered an EMG. AR 559. He also ordered an MRI of Symens's right foot to "better evaluate for evidence of synovitis." AR 559.

Symens completed a second disability report on January 27, 2010, in which she stated that her memory, fatigue, flu-like symptoms, paresthesias, and pain had worsened. AR 206, 207. She stated further that her pain and fatigue limited her ability to drive, do housework, and care for herself. AR 213. Dr. Larry Vander Woude, a non-examining state-agency physician, reviewed Symens's file on February 24, 2010. AR 506. He affirmed Dr. Terry's assessment and noted that Symens most recent appointment with a rheumatologist showed no active synovitis. AR 506.

Symens saw Dr. Mumm again on April 20, 2010. AR 551. Dr. Mumm remarked in his notes that the MRI of Symens's right foot revealed no inflammatory changes or synovitis but did show some mild degenerative joint disease at the first MTP joint. AR 540, 551, 553. Dr. Mumm's impression was that Symens's paresthesias in her hands and feet had improved since January and that an EMG study concerning this ailment was "reassuring." AR 551, 553. Dr.

Mumm noted that in March he had switched Symens from Humira to Enbrel[28] to see if she got greater symptomatic relief. AR 551. Although Symens felt better on the Enbrel and Arava then she did on the Humira and Arava, she still complained of longstanding fatigue and pain that was aggravated by walking or using her hands a lot. AR 551, 553. Other than mild tenderness over her right MCP joint, Symens's joint examination was unremarkable; she had no swelling and displayed a full range of motion in her hips, knees, and shoulders. AR 552. Under the "Recommendations" section of his notes, Dr. Mumm stated: "I reassured her that I do not find much evidence to suggest disease activity of a rheumatoid arthritis as the cause for arthralgias. I explained to her that in some cases, patients can have fatigue and arthralgias for other reasons . . . ." AR 553.

Symens saw P.A. Streff on May 3, 2010. AR 578. An examination showed that Symens had "many aphthous ulcers" in her mouth and P.A. Streff prescribed Clotrimazole.[29] AR 578. Dr. Halligan reevaluated Symens on July 27, 2010. AR 540. Symens complained of pain in her wrists with the right wrist being more painful than the left, and pain in hands, feet, and neck. AR 540, 541. Symens denied functional loss but reported that her discomfort made daily living activities difficult. AR 541. Symens further reported that she had a fever, felt sickly when her joints pained her, and was fatigued. AR 541. Although an examination revealed no obvious swelling or synovitis in Symens's upper or lower extremities, she had pain in her wrists upon palpation, tenderness in her hands, and pain with range of motion in her ankles and metatarsals.

---

[28]Enbrel is used to treat the symptoms of rheumatoid arthritis and to prevent joint damage. See Drugs.com, Enbrel, www.drugs.com/enbrel.html (last visited February 18, 2014).

[29]"Clotrimazole is an antifungal medication." Drugs.com, Clotrimazole, http:www.drugs.com/mtm/clotrimazole.html (last visited Feb. 18, 2014).

AR 542. Symens had an appropriate gait and cervical and lumbar range of motion for her age, and her proximal and distal strength in her upper and lower extremities was grossly intact. AR 542. Symens was not tender over any fibromyalgia trigger points. AR 543. Under the "Impression" section of her notes, Dr. Halligan stated:

> I have discussed with the patient that . . . her pain is out of proportion to what her examination would explain at this time. I do not see obvious synovitis on her examination today. I have discussed with the patient the reasons for this could be: 1. Subclinical synovitis. 2. Chronic pain syndrome.

AR 543. Dr. Halligan ordered an MRI of Symens's right hand to determine whether there was any synovitis. AR 543. Dr. Halligan diagnosed Symens as having rheumatoid arthritis and multiple joint pains. AR 545.

Symens returned to Dr. Halligan on August 30, 2010, for a follow up. AR 533. Symens reported diffuse joint pain, mainly in her hands and feet. AR 533. She also complained of fatigue, a cough, heart palpitations, nausea, depression, and problems sleeping. AR 533. An examination showed no evidence of synovitis, a normal range of motion in Symens's extremities, and no tenderness over fibromyalgia trigger sites. AR 535. Consistent with previous examinations, Symens had an appropriate gait and cervical and lumbar range of motion for her age, and her proximal and distal strength in her upper and lower extremities was grossly intact. AR 535. Dr. Halligan noted that the MRI of Symens's right hand showed no evidence of synovitis and concluded that rheumatoid arthritis was not causing Symens's pain at that time. AR 536. Dr. Halligan diagnosed Symens as having chronic widespread pain in addition to rheumatoid arthritis. AR 537. When discussing this diagnosis with Symens, Dr. Halligan explained that fibromyalgia is a "subset" of chronic widespread pain. AR 536. Dr. Halligan

prescribed Neurontin[30] to treat Symens's chronic widespread pain and physical therapy for her fibromyalgia. AR 536.

Dr. Halligan reevaluated Symens on December 2, 2010. AR 521. Symens reported diffuse joint and muscle pain, including pain in her hands, wrists, shoulders, hips, knees, ankles, and feet, but denied any loss of range of motion in her joints. AR 521. She also complained of occasional paresthesias in her feet and trouble sleeping because of her pain. AR 521-22. An examination showed no evidence of active synovitis, an appropriate gait and cervical and lumbar range of motion, and normal proximal and distal strength in the upper and lower extremities. AR 523. Although Symens had pain in her wrist with range of motion, her wrist examination was "entirely normal." AR 523. Blood tests from that day showed that Symens had a positive rheumatoid factor. AR 529, 596. Dr. Halligan diagnosed Symens with rheumatoid arthritis and chronic widespread pain. AR 525. She discussed with Symens the role of diet and exercise in treating chronic widespread pain and recommended that Symens lose weight, engage in low-impact aerobic exercise, start physical therapy, and continue her medications. AR 524-25. Because Symens was unable to afford physical therapy, she stated that she would walk instead. AR 524.

At a January 7, 2011 appointment with P.A. Streff, Symens complained of numbness in her feet that made it difficult to walk and pain in her toes. AR 567. Symens's feet were tender to palpitation. AR 567. P.A. Streff ruled out the possibility of neuropathy and assessed Symens as having numb toes. AR 567. She ordered a nerve conduction study of Symens's legs and a test to assess Symens's circulation. AR 567. Arterial testing of Symens's lower extremities on

---

[30]Neurontin is an anti-epileptic medication occasionally used to treat nerve pain. See Drugs.com, Neurontin, www.drugs.com/neurontin.html (last visited Feb. 18, 2014).

January 11, 2011, showed abnormal results that were "suggestive of significant peripheral arterial disease in both legs." AR 508.

Upon a referral from Dr. Halligan, Dr. Thomas Ripperda saw Symens on January 20, 2011. AR 590. Symens reported her pain as being a "10/10" at times, having occasional numbness or tingling in her hands, feet, and legs, and having some difficulty with balance. AR 590. She stated that walking, increased activity, and prolonged sitting aggravated her symptoms. AR 590. On examination, Symens had "2+ dorsalis pedis pulses on the left and 1+ on the right." AR 591. Symens had a good range of motion in her shoulders, elbows, wrists, fingers, knees, ankles, and hips. AR 591. She also had good strength and normal muscular tone in her upper and lower extremities and a normal gait pattern. AR 591. Dr. Ripperda's impression was that Symens had, among other conditions, chronic polyarthralgias and seropositive rheumatoid arthritis. AR 591-92. He recommended Lidocaine ointment,[31] an increased dosage of Tramadol, and a wrist wrap. AR 592.

Symens complained of foot coldness and numbness during a January 24, 2011 appointment with Dr. Gregory Schultz, a vascular surgeon. AR 586. Dr. Schultz noted that Symens showed evidence of a "vasospastic condition" and prescribed Procardia.[32] AR 586.

Symens saw Dr. Ripperda again on March 10, 2011, for ongoing pain. AR 588. Symens reported "aching and throbbing" pain that increased after she walked approximately 200 feet or sat for a prolonged period of time. AR 588. She stated that although she did not have any limitations in her bathing, grooming, or dressing activities, she believed that her symptoms

---

[31]Lidocaine ointment contains a local anesthetic agent and is administered topically. See Drugs.com, Lidocaine Ointment, http://www.drugs.com/pro/lidocaine-ointment.html (last visited Feb. 18, 2014).

[32]Procardia is used to prevent certain types of chest pain and may also be used to treat Raynaud's syndrome. See WebMD.com, http://www.webmd.com/drugs/drug-10981-Procardia+Oral.aspx?drugid=10981 (last visited Feb. 18, 2014).

prevented her from working. AR 588. Symens reported a twenty-five percent improvement in her symptoms while taking Tramadol extended release, but noted that the Tramadol made her nauseated. AR 588. She took Zofran[33] for the nausea but it made her dizzy. AR 588. An examination of Symens's upper extremities showed a normal range of motion, "5/5" strength, normal muscular tone, intact sensation, and no muscle atrophy. AR 589. In the "Recommendations" portion of his notes, Dr. Ripperda stated that Symens "certainly has medical reason to have [her persistent arthralgic symptoms] with her rheumatoid arthritis[.]" AR 589. He prescribed a Butrans patch[34] and recommended that Symens discontinue the Tramadol because her nausea was limiting its therapeutic benefit. AR 589.

Dr. Halligan saw Symens again on March 17, 2010. AR 510. Symens had started taking Methotrexate again and reported that this caused an increase in nausea and mouth ulcers. AR 510. She stated further that although the Butrans patch improved her pain, it did not resolve it. AR 510. Symens denied any swelling or loss of range of motion, but complained of diffuse joint and muscle pain, paresthesias, and a change of color in her feet when they were cold. AR 511. She also reported problems with thinking, her memory, and sleeping. AR 510-11. On examination, Symens had a normal range of motion in her spine and extremities and her gait was appropriate for her age. AR 512-13. Symens had intact proximal and distal strength in her upper and lower extremities and showed no evidence of synovitis. AR 512-13. Under the "Impressions" section of her notes, Dr. Halligan noted that Symens's vascular physician had

---

[33]Zofran is used to treat nausea and vomiting. See Drugs.com, Zofran, http://www.drugs.com/zofran.html (last visited Feb. 18, 2014).

[34]A Butrans patch contains an opioid pain medication and is used to treat moderate to severe chronic pain around the clock. See Drugs.com, Butrans, http://www.drugs.com/butrans.html (last visited Feb. 18, 2004).

diagnosed Symens with Raynaud's syndrome and stated that she agreed with this diagnosis together with the prior diagnosis of rheumatoid arthritis and chronic widespread pain. AR 513-14.

At a March 28, 2011 appointment with P.A. Streff, Symens complained of her feet being blue and purple then turning hot and red. AR 563. Symens wondered whether this was a reaction to certain medications she was taking for her Raynaud's syndrome. AR 563. On examination, Symens's feet had a blue hue. AR 563. P.A. Streff assessed Symens as having probable Raynaud's phenomenon and explained that while it was too soon to know whether Symens's medications were causing her symptoms, Symens needed to keep her feet as warm as possible. AR 563.

Dr. Halligan reevaluated Symens on June 23, 2011. AR 594. Although Symens's nausea had improved since she switched to an injectable form of Methotrexate, she was still experiencing stiffness and joint and whole body pain. AR 594. Symens said that she was able to perform activities of daily living but that it was uncomfortable. AR 594. She reported swelling in her MCP and PIP joints and described her fatigue as a "9/10." AR 594. An examination showed no obvious synovitis, no swelling, excellent grip strength, an appropriate gait and cervical and lumbar range of motion, and normal strength in Symens's upper and lower extremities. AR 596. Symens had some mild tenderness with palpitation of her MCP joints but was not tender over fibromyalgia trigger sites. AR 596. Dr. Halligan remarked in her notes that Symens was "doing very well in regards to her inflammatory arthritis" and stated that she saw "no evidence of active disease." AR 596. She diagnosed Symens with rheumatoid arthritis and chronic widespread pain and recommended that Symens continue on her medications. AR 597.

Symens's hearing before the ALJ occurred on April 14, 2011.  AR 33.  Present at the hearing were Symens, her attorney Rick Ribstein, her husband Curtis, and her sister Deanna Lee. AR 35.  Vocational expert Dr. William Tucker appeared by telephone.  AR 35.

Symens testified that although she was receiving treatment for her rheumatoid arthritis, she still had "a lot" of pain in her hands, feet, ankles, neck, wrists, and hips.  AR 44.  She felt a throbbing pain in her joints that became sharp upon use.  AR 47-48.  She described her pain level as four to five during the day and a seven to eight in the evening.  AR 49.  When her feet got too cold it felt "like a ten on the pain scale."  AR 48.  Symens complained that her pain occasionally disrupted her sleep, AR 45, 54-55, and described feeling fatigued and like she had the flu, AR 45, 55, 56.

In regard to the limiting effects of her pain, Symens testified that when she engaged in "housework, sweeping, you know, a lot where I'm on my feet—I'll pay for it in the evening."  AR 45.  Symens said she was usually able to use her hands, AR 45, but that wrist pain made it difficult for her to open a medicine bottle, AR 46, and stir things when cooking, AR 55.  When her wrist pain flared up, she needed two hands to lift a full gallon of milk, AR 46, and had difficulty brushing her hair, AR 55, AR 46.  Symens testified that she could only stand comfortably for fifteen minutes, AR 50; that on approximately three days a week, the most she could do for exercise was walking two hundred feet to the mailbox and back, AR 50-51; that crouching and kneeling was painful, AR 51; and that driving for an hour caused great pain in her hips, AR 44, 49.  Symens was able to go grocery shopping, but not without discomfort, AR 50, 57; she testified that a recent hour-long shopping trip caused significant pain and swelling in her feet, AR 47.  She testified that her "rheumatologist nurse" had told her to stay off her feet and

25

to keep them elevated. AR 45. Symens did not believe that her doctors had ever restricted the amount of weight she could lift, however. AR 45.

Symens testified that she was on a number of medications, including Neurontin, Methotrexate, and Tramadol. AR 52. She said that the Neurontin and Tramadol caused her dizziness and made her nauseated, and that the Methotrexate gave her mouth sores and made her fatigued. AR 52.

When asked to describe her typical day, Symens testified that her pain and flu-like symptoms usually prevented her from doing anything until the afternoon. AR 55-56. If she felt well enough, she would try to do one or two things, such as sweep the floor, wash the dishes, or do the laundry. AR 56. Symens testified that she cooked for her children, but added that the meals would be more simple if she was feeling poorly. AR 56. On a bad day, Symens would lay in bed or her recliner or sleep twelve to fifteen hours. AR 56. Symens estimated that she had four to five of these bad days a week. AR 56.

Curtis, who drove truck and was often away from home, testified that Symens would tell him over the phone that she was nauseated and had throbbing feet that she needed to put up. AR 58. Curtis stated that Symens's wrists were tender to touch and recounted a time when her wrist pain prevented her from carrying a pail of beans from the garden. AR 58-59. He also testified that Symens was unable to carry dog food into the house and that when he was home he would take care of their children and do some cooking so that Symens got a break. AR 60. Curtis believed that Symens's condition was worsening. AR 60.

Lee, who lived in Arkansas and did not see Symens that often, testified that she had noticed a "downhill slide" in Symens's health over the past two years. AR 61. Lee testified that Symens would visit her in Arkansas "every now and then" but that it would take Symens two or

26

three days to recover from the trip. AR 62. Lee also stated that Symens had become less active and often complained to Lee that she was in pain and felt like she had the flu. AR 61, 63.

The ALJ also heard testimony from Dr. Tucker, the vocational expert. AR 64. Dr. Tucker had completed a past relevant work summary in which he classified as "light" and "skilled" Symens's jobs as a biologist, a graduate assistant, a fish culturist, and a retail store manager. AR 233. The ALJ asked Dr. Tucker to assume a person of Symens's work experience who could lift twenty pounds occasionally and less than ten pounds frequently; could sit six hours in an eight-hour work day; could stand and walk combined for six hours in an eight-hour work day; had no limits in reaching; could occasionally climb ladders and stairs; had frequent but not constant use of the right hand for handling and gripping; could balance frequently but otherwise crouch, kneel, stoop, and crawl only on occasion; had no visual limits with proper glasses and no communications limits; and who had to avoid concentrated exposure to cold temperatures, wetness, and high humidity. AR 65. The ALJ asked Dr. Tucker to assume further that the hypothetical person was:

> afflicted with pain and discomfort from a variety of sources that would produce mild to moderate chronic pain and discomfort likely noticeable at all times, but with appropriate medication, they could be active within the limits I've described. They would, however, have mild limits on activities of daily living, social functioning, and concentration, persistence, and pace.

AR 65. Dr. Tucker testified that such a person could not perform Symens's past jobs because although the Dictionary of Occupational Titles classified these jobs as light, the manner in which she performed them required heavy physical demands. AR 65-66.

The ALJ then altered the hypothetical, asking Dr. Tucker to assume that the person's pain and depression placed moderate limits on her persistence, pace, and ability to carry out details

27

and maintain extended concentration. AR 66. Dr. Tucker testified that such limitations would likely preclude a person from having a skilled job. AR 66. The ALJ asked Dr. Tucker to take into account any transferable skills a person with Symens's work history might possess and to identify semiskilled jobs such a person could perform. AR 67. Dr. Tucker testified that Symens could work as a retail sales clerk, a recreational facility attendant, an appointment clerk, and a reviewer. AR 68.

## III.   The Disability Determination and the Five-Step Procedure

At the outset of his decision, the ALJ found that Symens met the insured status requirements of the Social Security Act through December 31, 2011. AR 13, 15. To receive disability insurance benefits, a claimant must establish that she was insured under the Social Security Act when she was disabled. Hinchey v. Shalala, 29 F.3d 428, 431 (8th Cir. 1994). Thus, Symens needed to show that she was disabled on or before December 31, 2011. Id. The ALJ then applied the five-step sequential evaluation process mandated under 20 C.F.R. § 404.1520(a)(4) to determine whether Symens was disabled. Under this five-step analysis, an ALJ is required to examine:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;"
> (2) whether the claimant has a severe impairment–one that significantly limits the claimant's physical or mental ability to perform basic work activities;
> (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience);
> (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and
> (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

28

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998) (footnote omitted). If the ALJ can make a conclusive disability determination before step five, the applicable regulation requires the ALJ to make that determination and not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). If the ALJ cannot make such a determination before step five, the ALJ must evaluate each step. Id. Between steps three and four, the ALJ assesses the claimant's residual functional capacity (RFC). Id.

At step one, the ALJ determined that Symens had not engaged in substantial gainful activity since January 10, 2009, her alleged onset date. AR 15. At step two, the ALJ found that Symens had the following severe impairments: rheumatoid arthritis, Sjogren's syndrome, degenerative disc disease, carpal tunnel syndrome, pain and fatigue syndrome, and depression. AR 15. The ALJ concluded under step three that these impairments, either individually or in combination, did not meet or medically equal one of the listed impairments. AR 15-18.

After reviewing the evidence, the ALJ then calculated Symen's RFC, determining that Symens could perform light work with certain limitations. AR 18-26. In reaching this conclusion, the ALJ evaluated the credibility of Symens's subjective complaints. As part of this evaluation, the ALJ noted Dr. Dame's opinion that Symens was disabled but gave the opinion little weight; the ALJ stated that it was based largely on Symens's physical impairments and was therefore outside of Dr. Dame's expertise. AR 25. The ALJ gave great weight to the state medical consultants' assessments because he found that they were consistent with the record as a whole. AR 26. The ALJ ultimately concluded that Symen's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Symen's statements regarding the intensity, persistence, and limiting effects of these symptoms were not credible "to the extent they are inconsistent with [the RFC determination]." AR 25. He based

this conclusion on the objective medical evidence, the lack of physician-imposed restrictions, Symens's reason for stopping work, Symens's description of her daily activities being inconsistent with her complaints of disabling symptoms and limitations, and Symens's treatment being generally successful in controlling her symptoms. AR 18-26.

The ALJ then proceeded to step four, finding that Symens could not perform her past relevant work as a biologist, a graduate assistant, a fish culturist, or a retail store manager because the mental demands of this work exceeded her RFC. AR 26-27. At step five, however, the ALJ found that Symens could perform other jobs that exist in significant numbers in the national economy, including retail sales clerk, recreational facility attendant, appointment clerk, and reviewer. AR 27-28. The ALJ therefore found that Symens was not disabled under the Social Security Act. AR 28.

## IV.    Standard of Review

When considering an ALJ's denial of Social Security benefits, a district court must determine whether the ALJ's decision "complies with the relevant legal requirements and is supported by substantial evidence as a whole." Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence on the record as a whole" entails "a more scrutinizing analysis" than "substantial evidence," which is "merely such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998) (citations and internal marks omitted) (noting that it is not sufficient for the district court to simply say there exists substantial evidence supporting the Commissioner). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable

mind would find it adequate to support the Commissioner's conclusion.'" Pate-Fires, 564 F.3d at 942 (quoting Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006)). "Substantial evidence means more than a mere scintilla." Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Neal v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005)). A district court "must consider both evidence that supports and evidence that detracts from the Commissioner's decision." Pate-Fires, 564 F.3d at 942 (quoting Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007)). Additionally, "[a]s long as substantial evidence in the record supports the Commissioner's decision, [the court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (internal citation omitted).

A district court also reviews the Commissioner's decision to determine if appropriate legal standards were applied. See Roberson v. Astrue, 481 F.3d 1020, 1022 (8th Cir. 2007). The district court reviews de novo the ALJ's ruling for any legal errors. Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011); Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

## V.    Discussion

Symens argues that the ALJ's decision is not supported by substantial evidence on the record as a whole and free of legal error. She raises four issues on appeal:

> I. At step three, was the ALJ required to consider whether Symen's diagnoses of rheumatoid arthritis and chronic widespread pain equaled Listing 14.09D (20 C.F.R. Part 404, Subpart P, Appendix 1)?
> II. Was the ALJ's credibility finding made in accordance with legal criteria and supported by logic and substantial evidence on the record as a whole?
> III. Did the ALJ assess residual functional capacity in accordance with legal standards and based upon substantial evidence in the record as a whole?

IV. Was the ALJ's Step Five finding made in compliance with legal standards and supported by substantial evidence on the record as a whole?

Doc. 16 at 44.

### A. Step Three

Symens argues that the ALJ erred at step three by failing to consider whether her combined diagnoses of rheumatoid arthritis and chronic widespread pain were medically equivalent to Listing 14.09D, the listing for inflammatory arthritis. The Commissioner disagrees, contending that the evidence was insufficient to warrant analysis under Listing 14.09D and that the ALJ's analysis of other listings establishes that the ALJ would have found that Symens was unable to meet the criteria of 14.09D.

The Listing of Impairments describes impairments for each of the major body systems that the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). At step three, the ALJ must determine whether a claimant's impairments, when taken individually and in combination, meet or are medically equal to a listed impairment. Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003). When a claimant has "a combination of impairments, no one of which meets a listing . . . [the ALJ] will compare [the claimant's] findings with those for closely analogous listed impairments." 20 C.F.R. § 404.1526(b)(3). To be medically equivalent, a combination of impairments must be "at least equal in severity and duration to the criteria in any listed impairment." Id. § 404.1526(a). "Medical equivalence must be supported by medical findings; symptoms alone are insufficient." Finch v. Astrue, 547 F.3d 933, 937 (8th Cir. 2008). The claimant bears the burden of establishing that her impairments equal a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

Symens argues first that the ALJ failed to include her diagnosis of chronic widespread pain in his step two findings of severe impairments and that this tainted the ALJ's step three analysis. Symens is mistaken; the ALJ found that one of Symens's severe impairments was "pain and fatigue syndrome[.]" AR 15.

Symens argues next that the ALJ did not specifically discuss whether her rheumatoid arthritis and chronic widespread pain were medically equivalent to Listing 14.09D. Although this is correct, the ALJ's failure in this regard does not, standing alone, warrant reversal. As the United States Court of Appeals for the Eighth Circuit has explained, "[t]here is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011); see also Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) (fact that ALJ did not elaborate on conclusion that claimant did not meet or equal any listed impairment did not require reversal "because the record supports [the ALJ's] overall conclusion"); Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003) ( concluding that ALJ's failure to address a specific listing is not reversible error if record supports overall conclusion). Here, the ALJ concluded that "[a]lthough the claimant has impairments considered severe . . . these impairments were not attended, singly or in combination with any other impairment, with the specific clinical signs and diagnostic findings required to meet or equal the requirements of any listed impairment." AR 18. Thus, the question for this Court is whether the record supports the ALJ's overall conclusion that Symens's impairments did not meet or equal a listed impairment.

Listing 14.09D requires:

> Repeated manifestations of inflammatory arthritis, with at least two of
> the constitutional symptoms or signs (severe fatigue, fever, malaise, or
> involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living;
2. Limitation in maintaining social functioning;
3. Limitation in completing tasks in a timely manner due to deficiencies
in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09D.   Symens argues that she had inflammatory

arthritis and chronic widespread pain accompanied by several constitutional symptoms, including

a low-grade fever, poor sleep, fatigue, and malaise.   She asserts that these impairments and

symptoms resulted in marked limitations in her activities of daily living and her ability to

complete tasks in a timely manner.   The Commissioner disagrees, contending that Symens is

unable to meet Listing 14.09D because her functional limitations do not rise to the marked level.

A "marked" limitation is "more than moderate but less than extreme." 20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 14.00I5.   Further, a claimant "need not be totally precluded from performing an

activity to have a marked limitation, as long as the degree of limitation seriously interferes with

[the claimant's] ability to function independently, appropriately, and effectively." Id.

The record belies Symens's assertion that her rheumatoid arthritis, widespread chronic

pain, and constitutional symptoms resulted in marked functional limitations as required by

Listing 14.09D. As the ALJ noted, Symens reported to Dr. Dame that she cared for herself,

prepared her children for school, made meals for her family, and did household chores and book

work. AR 23, 25, 259.   Symens told Dr. Ripperda that she did not have any limitations in her

bathing, grooming, or dressing activities, AR 24, 588, and told Dr. Halligan that although it was

uncomfortable, she was able to get out of bed and do her activities of daily living, AR 594.

Further, Symens indicated in her function report that she helped her children with their

homework, paid bills, and drove, AR 197, 200, and testified at the hearing that she still enjoyed

reading and was able to go grocery shopping, AR 50, 57.   Although Symens points to several

portions of the record in support of her argument that she had marked limitations in activities of daily living, this evidence consists primarily of her own statements. Excerpts from Symens's medical records reveal that at times her own physicians opined that her complaints seemed out of proportion to her actual ailments. AR 180, 439, 543. This Court must defer to an ALJ's credibility determinations if such determinations "are supported by good reasons and substantial evidence[,]" Perks v. Astrue, 687 F.3d 1086, 1091 (8th Cir. 2012) (quoting Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006)), and cannot substitute its opinion on credibility for that of the ALJ who had the benefit of live testimony, Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004). The ALJ's conclusion that Symens's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC determination is supported by good reasons and substantial evidence. Because the ALJ properly discredited Symens's statements concerning her limitations, these statements fail to establish that her activities of daily living were marked.

Nor has Symens demonstrated that she suffered from a marked limitation completing tasks in a timely manner because of deficiencies in concentration, persistence, or pace. When considering whether Symens's depression equaled a listed impairment, the ALJ acknowledged that Symens complained of trouble with concentration, memory, completing tasks, and following instructions, but concluded that Symens's depression caused only a moderate, rather than marked, limitation on her concentration, persistence, and pace. AR 17. In support of this conclusion, the ALJ noted that Symens's doctors frequently described her as "alert and/or oriented" and that Dr. Dame found that Symens was "only mildly and periodically impaired in attention and concentration, with no deficits of remote memory and moderate disturbance of recent recall." AR 17, 260. Although the ALJ cited these facts in the context of determining whether Symens

35

had a listed mental impairment, these facts undermine Symens's argument that her rheumatoid arthritis and chronic widespread pain caused marked limitation in her ability to complete tasks in a timely manner. Further, as with Symens's argument concerning her activities of daily living, her argument that she had marked limitations completing tasks in a timely manner rests mainly on statements that the ALJ properly discredited. There is substantial evidence in the record supporting the ALJ's overall conclusion that Symens's impairments did not meet or medically equal a listed impairment.

### B. Credibility Finding

Symens argues that the ALJ erred by improperly evaluating her statements concerning her pain and limitations. The Commissioner contends that the ALJ gave good reasons for finding Symens less than credible and that Symens's attempt to invalidate these reasons is unsuccessful.

When analyzing a claimant's subjective complaints of pain and limitation, an ALJ must consider the objective medical evidence, the claimant's work history, and the "Polaski factors," which include: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Perkins v. Astrue, 648 F.3d 892, 900 (8th Cir. 2011) (internal quotation marks omitted) (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). An ALJ need not explicitly discuss each Polaski factor, but an ALJ who rejects subjective complaints "must make an express credibility determination explaining the reasons for discrediting the complaints." Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)).

36

Although an ALJ may not discount a claimant's subjective complaints solely because they are not fully supported by objective medical evidence, a claimant's complaints "may be discounted based on inconsistencies in the record as a whole." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005).  A district court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Perks, 687 F.3d at 1091 (quoting Pelkey, 433 F.3d at 578).  The Eighth Circuit has cautioned judges against "substitut[ing] [their] opinion for that of the ALJ, who is in a better position to assess credibility." Eichelberger, 390 F.3d at 590.

As the Eighth Circuit has frequently stated, "there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (quoting Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  Here, the ALJ listed the Polaski factors and engaged in a detailed review of the testimony and medical evidence before ultimately concluding that Symens's statements concerning the intensity, persistence, and severity of her symptoms were not credible to the extent they were inconsistent with the RFC determination.  AR 18-26.  Symens takes a shotgun approach to the ALJ's credibility determination, offering eighteen different arguments why it is erroneous. Doc. 16 at 49-63. These arguments can be grouped into several loose categories of objections—to the ALJ's treatment of third-party testimony and Dr. Dame's opinion, to the ALJ's analysis of the medical evidence and inferences he drew therefrom, and to the ALJ's reliance on Symens's daily activities, the absence of physician-imposed restrictions, and Symens's reasons for stopping work.

As noted above, the ALJ found that Symens's description of her daily activities undermined her credibility.  AR 26.  The Eighth Circuit has recognized that its cases "send

mixed signals about the significance of a claimant's daily activities in evaluating claims of disabling pain[,]" Clevenger v. Soc. Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009), and that, for instance, the "ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work[,]" Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000). Nonetheless, an ALJ should consider a claimant's daily activities, and courts must evaluate an ALJ's credibility determination—based in part on the claimant's daily activities—under the substantial evidence standard. Moore v. Astrue, 572 F.3d 520 (8th Cir. 2009); Clevenger, 567 F.3d 971. The Eighth Circuit in Moore held that the ALJ gave good cause for discrediting the claimant when, among other factors, the ALJ considered that the claimant's ability to do housework, prepare meals, and eat out were inconsistent with her testimony about her pain. Moore, 572 F.3d at 524. In Clevenger, the Eighth Circuit found that it was "not unreasonable" for the ALJ to rely on the claimant's daily activities—which included doing laundry, washing dishes, changing sheets, ironing, preparing meals, driving, attending church, and visiting friends—to infer that the claimant's "assertion of disabling pain was not entirely credible." Clevenger, 567 F.3d at 976.

Symens told Dr. Dame that she cared for herself, prepared her children for school, made meals for her family, and did household chores and book work. AR 23, 25, 259. She stated in her function report that she helped her children with their homework and prepared them for bed. AR 197. Symens told Dr. Ripperda that she did not have any limitations in her bathing, grooming, or dressing activities, AR 24, 588, and testified at the hearing that she could drive, AR 49-50, and was able to go grocery shopping, AR 50, 57. The ALJ found that Symens's decision to travel to Arkansas to visit her sister suggested that Symens may have been overstating her symptoms and limitations. AR 20. The ALJ concluded that Symens's daily

activities—particularly her completion of household chores and caring for two young children—were inconsistent with her complaints of disabling pain and limitations. AR 26. In a medical report submitted after the ALJ issued his decision, Symens told Dr. Halligan that although it was uncomfortable, she was able to get out of bed in the morning and "do her activities of daily living[.]" AR 594. Symens's continuation of her nursing program further supports the ALJ's credibility determination; although Symens alleged a disability onset date of January 10, 2009, she did not stop going to school until July 2009. AR 39, 232, 258. Although Symens argues that the ALJ overstated the extent of her daily activities,[35] the record indicates that it was not unreasonable for the ALJ to rely on Symens's daily activities to infer that her claims of disabling pain and limitations were not entirely credible.

The ALJ also noted that none of Symens's treating physicians had imposed any restrictions on her. AR 26. Although he acknowledged Symens's testimony that her "rheumatologist nurse" told her to keep her feet up, the ALJ gave this statement no weight as the source of the statement was unknown and was not from an acceptable medical source. AR 26. The ALJ concluded that the absence of physician-imposed restrictions was inconsistent with Symens's allegations of totally disabling symptoms. AR 26. Relying on Pate-Fires, 564 F.3d at 943, Symens argues that there is no evidence that her physicians were asked about her functional

---

[35]In fairness, while Symens's acknowledged being able to engage in daily activities of life, she made clear that she believed herself to have many limitations. For instance, in her disability reports she stated that her pain and fatigue prevents her from concentrating, that her daily activities are severely limited, and that she had many bad days where she doesn't get anything done. AR 169, 180, 197, 202. According to Dr. Dame's report, Symens stated that she was only able to engage in activities of daily living for twenty to thirty minutes, that she required twenty minutes of rest afterwards, and that she felt "intense pain in her hands and neck" after more than thirty minutes of activity. AR 258-261. Symens also testified that she has four to five bad days a week where she lays in her bed or recliner or sleeps between twelve to fifteen hours. AR 56.

limitations and that it was therefore inappropriate for the ALJ to consider the lack thereof. Unlike in Pate-Fires, however, none of Symens's treating physicians opined that she had significant functional limitations. In Pate-Fires, the claimant's treating psychologist opined that the claimant's conditions and accompanying symptoms precluded her from working. The ALJ rejected the treating psychologist's opinion in part because he found that it was inconsistent with a consulting psychologist's opinion that was silent on the claimant's ability to work. Id. at 943. The Eighth Circuit held that because the consulting psychologist had never been asked to assess the claimant's ability to work, his silence on the issue could not constitute substantial evidence that the claimant was not disabled. Id. Indeed, a treating doctor's silence on the claimant's work capacity does not by itself constitute substantial evidence supporting an ALJ's functional capacity determination, especially when the doctor was neither asked to express an opinion on the matter nor did so, and especially when that doctor did not discharge the claimant from treatment. Hutsell v.Massanari, 259 F.3d 707, 712 (8th Cir. 2001). However, in Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000), the Eighth Circuit stated: "We find it significant that no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work." At least two district courts have relied on Young to distinguish Pate-Fires and Hutsell. For instance, in Howard v. Astrue, No. 4:10 CV 1389 JCH, 2011 WL 4007936, at *7 (E.D. Mo. Sept. 8, 2011), the court acknowledged Pate-Fires, but relied on Young for the proposition that the "lack of functional restrictions imposed by *any* of the claimant's physicians can be properly considered by the ALJ." Similarly, the district court in Agan v. Astrue, 922 F. Supp. 2d 730, 750 (N.D. Iowa 2013), cited Young and found that the ALJ did not err in considering the lack of any significant restrictions imposed by a treating physician as part of the overall credibility assessment. The circumstances in Symens's case are closer to Young, Agan,

40

and Howard than to Pate-Fires or Hutsell. The Eighth Circuit has routinely held that the absence

of any "significant restrictions placed on [a claimant's] activities by his doctors" can undermine

the claimant's subjective complaints of pain. Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999);

see also Moore, 572 F.3d at 525 ("A lack of functional restrictions is inconsistent with a

disability claim."); Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional

restrictions were placed on [the claimant's] activities, a fact that we have previously noted is

inconsistent with a claim of disability."); Tennant v. Apfel, 224 F.3d 869, 870-71 (8th Cir. 2000)

(per curiam) (concluding that ALJ properly relied on the absence of physician-ordered limitations

when discrediting claimant). Thus, the ALJ's reliance on the absence of any physician-imposed

restrictions was proper.

The ALJ found further that although Symens's persistence in seeking treatment would

normally weigh in her favor, the medical record revealed that treatment had been generally

successful in controlling her symptoms. AR 26. "Impairments that are controllable or amenable

to treatment do not support a finding of disability." Davidson v. Astrue, 578 F.3d 838, 846 (8th

Cir. 2009). In January 2009, Symens told Dr. Halligan that her joint pain had "essentially

resolved" on Prednisone. AR 456. Symens reported being eighty to ninety percent improved on

Humira in May 2009. AR 445, 443. In a December 2009 physical RFC assessment, Dr. Terry

concluded that medication was controlling Symens's rheumatoid arthritis and had resolved her

synovitis. AR 363. Dr. Vander Woude confirmed this conclusion in February 2010. AR 506.

Symens reported a flare-up of pain in April 2010 after switching medications, but stated that she

felt substantially better after beginning a course of Prednisone. AR 551. True, Symens's pain

sometimes worsened and her medications had side effects and required adjustment. Overall,

however, substantial evidence supports the ALJ's conclusion that Symens's pain was generally controllable. Davidson, 578 F.3d at 846.

The ALJ also considered that Symens stopped working when her grocery store closed rather than because of a disability. AR 26. Courts in the Eighth Circuit "have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); see also Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) (finding that claimant leaving work for reasons unrelated to his medical condition undermined his credibility). Symens stopped working when her store closed in May 2008, AR 232, but did not allege that she was disabled until January of 2009, AR 13. Nevertheless, the ALJ's consideration of why Symens stopped her last employment was not improper. See Lewis v. Colvin, No. 4:12CV247 TIA, 2013 WL 5298470, at *17 (E.D. Mo. Sept. 20, 2013) (relying on Kelley when the claimant had stopped working on September 20, 2008, because his employer closed but did not allege that he was disabled until May 13, 2009).

Lastly, the ALJ considered whether medical evidence supported Symens's subjective complaints of pain. The ALJ recounted Symens's multiple joint examinations as well as her x-rays and MRIs. AR 19-25. After her January 2009 appointment with Dr. Halligan, Symens rarely showed any evidence of synovitis, and Drs. Halligan and Mumm routinely found her strength, gait, and range of motion to be normal. AR 434, 444, 439, 448, 523, 535, 542, 558. Dr. Ripperda's examinations were similar, showing no evidence of joint effusion and normal strength, muscle tone, and range of motion in Symens's extremities. AR 588-89, 591. MRIs of Symens's foot and hand showed no synovitis, AR 536, 540, 551, 553, and x-rays of her hands, feet, and chest were unremarkable, AR 450.

Although these joint examinations, MRIs, and X-rays do little to substantiate Symens's subjective complaints, she argues that the medical evidence as a whole is consistent with her allegations of disabling pain. For instance, Symens points to Dr. Ripperda's statement in his March 2011 treatment notes that she "certainly has medical reason to have [persistent arthralgic symptoms] with her rheumatoid arthritis[.]" AR 589. Symens also takes issue with the ALJ's conclusion that the normal muscle tone and lack of atrophy in her extremities was "generally inconsistent with allegations of severely limited physical activity." AR 24. She contends that there was no medical evidence in the record to support this conclusion, and that the ALJ may not "play doctor." In Miller v. Sullivan, 953 F.2d 417, 422 (8th Cir. 1992), an ALJ discounted a claimant's allegations of disabling pain in part because her doctors had not reported muscle wasting, muscle atrophy, or decreased muscle strength. The Eighth Circuit observed that "although muscle deterioration may result from disuse, disabling pain does not always result in muscle disuse." Id. Thus, the ALJ could not discount the claimant's allegations "simply because she [did] not show an effect that other people suffering from disabling pain may show." Id. at 422-23.

The record is unclear concerning how much muscle deterioration someone with Symens's alleged limitations would experience. Whether a lack of muscle tone or deterioration is or is not significant depends at least in part on the unique nature of the claimed disability. Some district court cases from within the Eighth Circuit have treated a lack of muscle atrophy and normal muscle tone as undermining a claimant's credibility. See Hinton v. Astrue, 941 F. Supp. 2d 1054, 1077-78 (E.D. Mo. 2013) (affirming ALJ's credibility determination where the ALJ discredited the claimant's subjective complaints in part because the claimant showed normal muscle tone, bulk, and strength); Lindsley v. Astrue, No. 1:11-CV-92-DPM, 2012 WL 6042349,

at *2 (E.D. Ark. Dec. 4, 2012) (affirming ALJ's credibility determination because "[c]ontrary to

[the claimant's] testimony that her pain was disabling, her doctors encouraged her to maintain

an active lifestyle and did not impose restrictions. She also did not display any of the observable

manifestations of severe pain, such as weight loss, muscle atrophy, muscle spasms, or adverse

neurological signs"); Peterson v. Astrue, No. CIV 08-4771 (RHK/JJK), 2009 WL 1657461, at

*2 (D. Minn. June 11, 2009) (affirming ALJ's credibility determination where ALJ discredited

claimant's complaints in part because her statement that she could only walk one block was

inconsistent with medical records showing "normal strength and no atrophy in the lower

extremities, signs associated with chronic disuse of the muscles"); O'Brien v. Astrue, No.

4:05CV1559 RWS, 2007 WL 2226032, at *16 (E.D. Mo. Aug. 1, 2007) ("The ALJ's observation

about the absence of any reference in the medical records to a loss of muscle tone or to atrophy

is relevant [to the claimant's allegations of disabling pain]."). At least one other court has found

that normal strength and the absence of muscle atrophy do not undermine a claimant's credibility.

See Lapeirre-Gutt v. Astrue, 382 Fed. App'x 662, 665 (9th Cir. 2010) (mem.) ("[T]he ALJ noted

that [claimant's] lack of muscle atrophy was inconsistent with her allegations of inactivity, and

that her lack of radicular symptoms did not comport with testimony that she had trouble gripping

things. However, no medical evidence suggests that high inactivity levels necessarily lead to

muscle atrophy or that trouble gripping can stem *only* from radicular symptoms. Thus, these

findings are not based on substantial evidence."). Although Symens testified that her activities

were circumscribed, she also testified that she shopped, cared for herself and her children, and

did housework. These activities could have prevented any muscle deterioration. As mentioned

above, to some extent, these activities cast some doubt on some of Symens's statements about

the extent of her disability.

Symens also focuses on the ALJ's reference to Dr. Mumm's statement that he did "not find much evidence to suggest disease activity of a rheumatoid arthritis as the cause for [Symens's] arthralgias[,]" AR 23, and Dr. Halligan's statement that Symens's pain was "out of proportion to what her examination would explain at this time[,]" AR 24. Symens argues that these statements and other medical evidence, such as a lack of synovitis and a lack of other objective findings, were actually consistent with her diagnosis of chronic pain syndrome. In the notes from her July 2010 examination of Symens, Dr. Halligan stated that Symens's pain was out of proportion to the lack of obvious synovitis Symens showed. AR 543. Dr. Halligan explained that the reason for this could be either subclinical synovitis or chronic pain syndrome. AR 543. When an MRI of Symens's right hand showed no evidence of synovitis, Dr. Halligan concluded that rheumatoid arthritis was not causing Symens's pain and diagnosed her with chronic widespread pain. AR 536-37.

At bottom, some of the medical evidence is consistent with Symens's complaints, and some of the medical evidence is inconsistent with Symens's complaints. But this does not mean that the ALJ's credibility determination should be reversed. As the Eighth Circuit has explained, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, we must affirm the ALJ's decision." Moore, 623 F.3d at 602. The ALJ did not rely exclusively on the lack of supporting joint examinations, MRIs, and x-rays to discredit Symens's complaints of pain. Rather, he gave several good reasons for discounting Symens's credibility, including the lack of physician-imposed restrictions, Symens's reasons for stopping work, Symens's daily activities, and a finding that treatment was generally successful in controlling Symens's symptoms. Because substantial evidence supports these reasons, this Court must defer to the ALJ's credibility determination. See McDade v. Astrue, 720 F.3d 994,

998 (8th Cir. 2013) ("Because the ALJ [is] in a better position to evaluate credibility, we defer to his credibility determinations as long as they [are] supported by good reasons and substantial evidence." (quoting Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006))).

In the interest of completeness, this Court explains why Symens's remaining arguments do not warrant a contrary result. Specifically, Symens contends that the ALJ erred by failing to properly consider Dr. Dame's opinion about her disability and by not giving appropriate reasons for rejecting the testimony of Curtis and Lee. AR 261. The ALJ specifically discussed Dr. Dame's opinion but assigned it little weight, finding that it was largely based on Symens's physical impairments and was therefore outside of a psychologist's expertise. AR 25. A review of Dr. Dame's report supports this finding; despite being a psychologist and having seen Symens once, he concluded that she was "seriously disabled by virtue of the medical diagnosis of rheumatoid arthritis. She is chiefly disabled by the residual pain and the side effects of the medications used to treat this disorder." AR 261. A psychologist would neither be treating nor an expert in rheumatoid arthritis or physical side effects from medication therefor. The ALJ's decision to assign lesser weight to Dr. Dame's opinion on this basis was not erroneous. See Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010) (holding that ALJ properly discounted consulting psychologists' opinions because the opinions were largely based on the consideration of physical impairments, an area outside the psychologists' expertise).

Symens's argument concerning the testimony of Curtis and Lee fares no better. The testimony of Curtis and Lee was consistent with Symens's testimony; they recounted how Symens had described her symptoms to them and affirmed that Symens had certain limitations and was getting worse. AR 58-63. Noting this consistency, the ALJ discredited the testimony for the same reasons he discredited Symens's allegations. AR 20. When, as here, substantial

evidence supports the ALJ's determination that a claimant's allegations are not credible, the ALJ may properly discredit cumulative testimony offered by other witnesses. Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998). Accordingly, the ALJ did not err in this regard.

### C. Residual Functional Capacity

A claimant's RFC "is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Leckenby v. Astrue, 487 F.3d 626, 631 n.5 (8th Cir. 2007)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). "The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." Eichelberger, 390 F.3d at 591.

Symens makes multiple arguments why the ALJ's determination of her RFC was erroneous. Her first argument—that an inadequate credibility determination tainted her RFC—is undermined by this Court's finding that substantial evidence supported the ALJ's credibility determination. Furthermore, the ALJ did not simply ignore Symens's subjective complaints when determining her RFC. Rather, he acknowledged in the RFC that Symens "experiences pain and discomfort from a variety of sources that would produce mild to moderate chronic pain and discomfort, likely noticeable at all times . . . ." AR 18. "Due to pain and some depression," the ALJ stated, "the claimant has mild limitations with respect to activities of daily living; mild restrictions with respect to social functioning; moderate limitations with respect to concentration,

47

persistence, or pace; and moderate limitations in the ability to carry out details and maintain extended concentration." AR 19.

Symens next argues that her RFC was inadequate because the ALJ failed to incorporate limitations resulting from her carpal tunnel syndrome, which he had found was severe at step two. Dr. Pengilly assessed Symens as having bilateral carpal tunnel syndrome in August 2009, after Symens showed a positive Phalen's sign on both sides with the right being worse than the left and a positive Tinel's test on the right with a weakly positive Tinel's test on the left. AR 310. In January 2010, Dr. Peterson diagnosed Symens as having right de Quervain's tenosynovitis. AR 430. The ALJ incorporated these conditions into the RFC when he found that Symens could frequently, but not constantly, use her right hand for gripping and handling. AR 18. Symens argues that her recurrent complaints of wrist pain warrant additional limitations with respect to her carpal tunnel syndrome. But an ALJ need not include subjective limitations in the RFC when, as here, he has found them not credible. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) ("Tellez fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were 'less than fully credible,' and we give the ALJ deference in that determination."). Further, the medical evidence does not support Symens's contention that additional limitations are necessary. After being assessed with carpal tunnel syndrome, Symens frequently exhibited normal strength in her upper extremities and a normal range of motion in her wrists and hands. AR 430, 434, 439, 444, 448, 491, 535, 542, 558, 588, 589, 591. She also had fine touch sensation in her upper extremities, AR 559, 589, and Dr. Halligan found that Symens's grip strength was "excellent" on two occasions, AR 439, 596. By January 2010, Symen's Phalen's sign was negative. AR 559. Finally, none of Symens's physicians ever imposed any functional limitations on her.

48

Symens also argues that the ALJ failed to incorporate limitations in the RFC from her peripheral arterial disease when he determined that she could "stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday[.]" AR 18. Symens's mere diagnosis of peripheral arterial disease does not mean that she experienced any significant limitations in her ability to walk or stand or that any corresponding restrictions are warranted in her RFC, however. Other than her complaints that she experienced pain when standing and walking, Symens does not point to any evidence that her peripheral arterial disease resulted in functional loss. Once again, the ALJ gave good reasons for finding Symens's statements concerning the intensity, persistence, and limiting effects of her symptoms not credible to the extent that they were inconsistent with the RFC determination. Further, substantial evidence supported the ALJ's determination that she could stand or walk for a total of about six hours in an eight hour workday. Not only did Dr. Terry and Dr. Vander Woude reach this conclusion, AR 357, 506, but also Symens's physicians reported that she had an appropriate gait and normal strength, muscle tone, and range of motion in her lower extremities. AR 434, 439, 444, 448, 523, 535, 542, 558, 591.

Symens argues next that her RFC is inadequate because the ALJ did not account for "exacerbations of illness." Doc. 16 at 65. When determining whether a claimant has the RFC to work, courts look to whether the claimant has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2005) (citation omitted). Symens contends that the ALJ "failed to reject, but simply disregarded, evidence that [her] functioning was marked by flares and that she had bad days where she could do very little[.]" Doc. 16 at 65. Symens does not explain which of her impairments would flare and

49

result in limitations in her ability to engage in sustained work. Instead, Symens cites to her hearing testimony that she had four to five bad days a week, AR 55-56, a June 2009 appointment with Dr. Pengilly when she complained of fatigue and showed a "little bit" of swelling in her wrist and pain with flexion and extension, AR 314, a July 2009 appointment with Dr. Pengilly when she still showed a "bit" of swelling in her wrist and "some pain," AR 313, a May 2010 appointment with P.A. Streff when she reported neck pain and stated that she had experienced flares of pain over the past two weeks, AR 577, and a December 2010 appointment with Dr. Halligan when she complained of problems sleeping because of pain and stated that her pain was worse in the morning but improved as the day progressed, AR 522. That Symens occasionally reported flares in pain to her doctors and had some swelling early in the time period of her alleged disability does not establish that her flares were so severe and frequent that the ALJ should have incorporated corresponding limitations in her RFC. Rather, Symens's argument that the ALJ should have incorporated such limitations rests chiefly on her testimony at the hearing. Because the ALJ properly discredited Symens's subjective complaints, he was not required to incorporate limitations based on such complaints. Wildman, 596 F.3d at 969.

Finally, Symens argues that reversal is warranted under Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000), because the ALJ relied solely on the physical RFC assessments by Dr. Terry and Dr. Vander Woude when determining her RFC. In Nevland, the Eighth Circuit reversed and remanded the ALJ's decision because there was "no *medical* evidence about how [the claimant's] impairments affect his ability to function now." Id. at 858. Rather than seeking an opinion on the claimant's RFC from a treating or examining physician, the "ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [the claimant's] RFC." Id. "The opinions of doctors who have not examined

50

the claimant[,]" the Eighth Circuit explained, "ordinarily do not constitute substantial evidence on the record as a whole." Id.

Unlike in Nevland and contrary to Symens's contention, the ALJ in this case did not base Symens's RFC solely on the reports of non-examining, non-treating physicians.  In addition to considering the reports from Dr. Terry and Dr. Vander Woude, the ALJ engaged in an extensive review of the medical evidence.  This review—noting that there were no physician-imposed restrictions, that Symens's conditions were generally controllable with medication, that Dr. Halligan and Dr. Mumm routinely found that Symens's strength, gait, and range of motion were normal, and that Dr. Ripperda found that Symens showed no evidence of joint effusion and had normal strength and muscle tone with no muscle atrophy—not only supported the ALJ's conclusion that Symens could engage in light work with some limitations but also was consistent with the reports from Dr. Terry and Dr. Vander Woude.  See Moore, 572 F.3d at 524 (finding that evidence that claimant had normal gait, rotation of fists and fingers, and full 5/5 strength both proximally and distally supported ALJ's RFC determination that claimant could engage in light work); Flynn v. Astrue, 513 F.3d 788, 793 (8th Cir. 2008) (concluding that substantial evidence existed to support the ALJ's RFC determination when treating physicians found that claimant had normal or full muscle strength and good mobility); Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (noting that although the opinion of a consulting physician does not usually constitute substantial evidence, substantial evidence supported the ALJ's decision that the claimant could perform other substantial gainful activity in the national economy where, in addition to considering a consulting physician's opinion, the ALJ considered the medical evidence, statements of the claimant's treating physician, the claimant's description of his daily activities, and the claimant's lack of motivation to return to work).  The ALJ also properly

51

considered Symens's description of her daily activities in determining her RFC. Under these circumstances, remand under Nevland is unnecessary. Krogmeier, 294 F.3d at 1024.

As indicated above, substantial evidence supported the ALJ's RFC determination. The ALJ properly analyzed the medical and non-medical evidence in the record and recognized that Symens has some limitations. Symens has not offered any arguments or evidence demonstrating that additional limitations are warranted.

### D.   Step Five Determination

Symens offers several reasons why the ALJ's finding that she could perform other work in the national economy was not in accordance with legal standards and was unsupported by substantial evidence. Symens argues first that the ALJ committed reversible error by failing to acknowledge the shift of the burden to the Commissioner at step five of the sequential analysis. Once a claimant proves that she is unable to perform her past relevant work, the burden shifts to the Commissioner to prove that, notwithstanding the claimant's impairments, the claimant can perform other jobs that exist in significant numbers in the national economy. Nevland, 204 F.3d at 857; Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). An ALJ's failure to acknowledge this burden shift to the Commissioner is reversible error "except in those cases in which the evidence is so strongly against the claimant that 'the outcome is clear regardless of who bears the burden of proof.'" Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000) (quoting Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 426 (8th Cir. 1988)); see also Pope v. Bowen, 886 F.2d 1038, 1040 (8th Cir. 1989) ("[W]e have frequently declared that the ALJ must expressly acknowledge the shift in the burden of proof and if the ALJ does not do so, we will not assume that the ALJ

implicitly shifted the burden of proof."). Contrary to Symens's argument, the ALJ did expressly

acknowledge the burden shift. The ALJ's opinion states:

> At the last step of the sequential evaluation process (20 CFR
> 404.1520(g)), the undersigned must determine whether the claimant is
> able to do any other work considering her residual functional capacity,
> age, education, and work experience. If the claimant is able to do other
> work, she is not disabled. If the claimant is not able to do other work
> and meets the duration requirement, she is disabled. Although the
> claimant generally continues to have the burden of proving disability at
> this step, a limited burden of going forward with the evidence shifts to
> the Social Security Administration. In order to support a finding that
> an individual is not disabled at this step, the Social Security
> Administration is responsible for providing evidence that demonstrates
> that other work exists in significant numbers in the national economy
> that the claimant can do, given the residual functional capacity, age,
> education, and work experience (20 CFR 404.1512(g) and
> 404.1560(c)).

AR 15. Although the ALJ did not restate the burden shift when finding that Symens was able

to perform other work in the national economy, it was unnecessary for him to do so. See

Dillehay v. Comm'r Soc. Sec. Admin., No. 4:08CV00019 JLH, 2009 WL 57507, at *1-2 (E.D.

Ark. Jan. 8, 2009) (finding that ALJ acknowledged burden shift when ALJ gave substantially

similar statement concerning step five but did not restate the burden shift later in the opinion

when discussing the facts).

Symens also argues that the hypothetical to the vocational expert failed to include all of

her limitations, but this Court's previous discussion of her RFC explains why this argument lacks

merit. See Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005) ("The hypothetical

question need only include those impairments and limitations found credible by the ALJ . . . .").

Next, Symens contends that the ALJ erred by identifying her job as a retail store manager as past

relevant work because this job did not constitute substantial gainful activity. Even assuming that

Symens is correct that her job as a retail store manager did not constitute substantial gainful activity, the ALJ did not err by considering it. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 554 n.3 (8th Cir. 1992) ("We disagree with the dissent's assertion that, under the regulations, a job must have constituted substantial gainful activity to be considered past relevant work."); see also Taylor v. Sullivan, 951 F.2d 878, 879-80 (8th Cir. 1991) (holding that Social Security regulations permit consideration of "past work experience that fell short of substantial gainful employment" to determine whether the claimant had transferable skills from prior work).

Finally, Symens argues that the ALJ erred in determining that she was capable of performing the jobs identified by Dr. Tucker without identifying any transferable skills from her past relevant work. At step five, the Commissioner has the burden of demonstrating that, given a claimant's age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012). The Commissioner may carry this burden by eliciting testimony from a vocational expert or by using the medical-vocational guidelines. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines, or 'Grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairments." Id. (quoting Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999)). If the claimant has non-exertional impairments, however, then use of the medical-vocational guidelines is inappropriate, and testimony from a vocational expert is required. Id.

54

Here, the ALJ relied on the testimony of vocational expert Dr. Tucker. Although the ALJ asked Dr. Tucker to take into account transferable skills Symens possessed, neither the ALJ nor Dr. Tucker specifically identified what these skills were. AR 67. Relying on Social Security Rulings (SSR) 82-41, 83-11, and Macarages v. Astrue, No. CIV-09-1270-D, 2010 WL 3749468 (W.D. Ok. Aug. 23, 2010), Symens argues that this was error. The court in Macarages held that SSR 82-41 required the ALJ to identify the claimant's transferable skills when the ALJ determined that the claimant could perform other skilled or semi-skilled work. 2010 WL 3749468, at *1-3. Although the Ninth Circuit has reached a similar conclusion, see Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1223-26 (9th Cir. 2009) (holding that specific findings on transferable skills are required under SSR 82-41 even where the ALJ relies on a vocational expert's testimony), this is not the law in the Eighth Circuit. In Tucker v. Barnhart, 130 Fed. App'x 67 (8th Cir. 2005) (per curiam) the Eighth Circuit held that an ALJ may rely on vocational expert testimony to find that a claimant has transferable skills and that SSR 82-41 did not require the ALJ or vocational expert to identify the claimant's transferable skills. Id. at 68 (citing Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 548-50 (6th Cir. 2004) (holding that SSR 82-41 only requires specific findings where the ALJ relies exclusively on the medical vocational guidelines to reach a determination)). Thus, the ALJ did not commit error by failing to specifically identify Symens's transferable skills.

## VI.   Conclusion

For the reasons stated above, it is hereby

ORDERED that the Commissioner's decision is affirmed and that Symens's motion, Doc. 15, is denied.

Dated March 4ᵗʰ, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE